Counsel, you may proceed. You're ready. Good morning, Your Honors. Daniel Maynard on behalf of the appellant Lloyd George Sinclair. I would like to reserve five minutes. Just watch the clock. Thank you, Your Honors. Your Honors, from the very beginning of this case, Mr. Sinclair was denied due process rights and ultimately denied his right to a fair trial. The first argument that we've made is that the statements that Mr. Sinclair made after he was arrested, four to five days after he was arrested, should have been suppressed under the circumstances of this case. We held a suppression hearing in front of the district court, and the district court found that the statements of the police officers were credible. We'd asked this court to take a look at the objective facts and determine whether or not under the facts, objective facts, that the district court was wrong in its determination. Mr. Sinclair contended that he had been beaten and threatened by the police when he was arrested. The police officers denied that that had happened. The objective facts are that there was a warrant that they were executing in New York City, that it's in January. They have seen somebody come to the window on at least two occasions, so they know somebody is in the home. The officer testifies that knowing that the warrant is on a triple homicide, that they knock, announce, kick in the door, and enter without guns drawn. Mr. Sinclair says that the officers came in, they had their guns drawn, he was hit, he was knocked to the floor, the guns were put to his head, and he was threatened. Now, how much of this was before the jury? None of this was before the jury. Okay. The officers then testify that there are other defendants that they are looking for under this warrant, and that they go ahead and search this facility, this apartment, without ever drawing their guns. Your Honor, that's just incredible under the circumstances of this case. Well, you know, it may be, but we're not a fact-finding body, as you well appreciate. We're an appellate court, and if a credibility, unless a credibility determination just leaps off the page is clearly erroneous, we're pretty much bound by it. And you're telling us, well, it's incredible, but we didn't get an opportunity, we don't have an opportunity to see the officers and to examine this the way a trial court does. I mean, you give us a good television scenario that may be correct, but unless there's some opportunity to see these officers, to weigh the circumstances, I mean, how are we going to cope with this? It's unfortunate that we don't videotape hearings so that the court can see them at this time. And I understand what the rule has been that appellate courts don't normally pay great deference to the trial court. You're on TV today. They're watching you in Seattle on my computer. But you know, I mean, credibility is really hard for an appellate court. That's what the trial courts are for. I understand, Your Honor. But this Court has found under certain circumstances, when you look at facts objectively that they are just incredible. Which department conducted the arrest? The New York City Police Department. So you're asking us to say, you're pretty much asking us to say, well, we've seen Andy Sipowich, we know what they do back there. This doesn't wash. No, I'm asking this court to understand that on a triple homicide, when detectives realize that there is somebody in that room, and they've said they've seen them twice, and they're executing a warrant, they don't go in without their guns drawn. That just doesn't happen. And that they don't go around looking for other defendants that they think may be in the apartment without ever pulling a weapon. Your Honor, that leaps off the page as being incredible. Why would they lie about that, though? It doesn't hurt their case if they break in under those circumstances with guns drawn. I can't tell you. And I wish that there had been a videotape. Even if you assume they did, what's the relief? I think you suppress the statement that he made. That's a non-sequitur. It doesn't necessarily follow just because they did or didn't testify correctly on that issue. That starts the sequence of events that follows. And you have to look at the individual facts in this case. What we have is an individual who doesn't have much relationship to the criminal justice system. He's only been arrested one time in his life before this. Secondly, if you assume that I am right and that they threatened his life, they beat him and they threatened his life by sticking the gun to his head, what then happens is we have an individual who has a 70 IQ. What's the temporal nexus between the entry and the statements? Was it immediate? Did he confess immediately? No. It's four to five days later. Yes. That's a pretty big break, isn't it? It's a pretty big break. And there may be an argument that somebody who has a certain level of intelligence could reflect on what they were doing and. Did these experts testify in the trial court in the motion to suppress about his mental capacity? There were reports from both experts. Did they testify or was it just reports? I'm sorry? Did they testify in person? They did not testify. They were just reports. There's one report that suggests that he's perfectly able to understand his rights, to waive them voluntarily, that he has the capacity to do that even though he's mentally impaired. The government's reports, the defendant's report says that with the help of counsel, he can participate in the trial process. The government's report says at the time of this hearing, he understands what his rights are. He's now been incarcerated for over a year. He's been living in a federal prison down in Phoenix. He's been in court numerous times and we've had at least four meetings by this point with the U.S. attorney and the investigators. So the knowledge that he has at that point versus the knowledge that he has in January 23rd of 2003 is completely different. He's got a 70 IQ. The reports indicate that he reads at a third grade level. He's an eight-year-old. That's where he's reading at. And then he doesn't get taken in front of a magistrate. He's held for five days. Now, why do they hold him for five days? I don't know. Is it because they want to have him in isolation? I don't know that. I don't know if it's to try to intimidate him. I don't know if it's to wait for the officers to come from Phoenix so that they can interrogate him, which is what actually happens in the case. I don't know if he has bumps and bruises and they don't want it to show. But he doesn't go in front of a magistrate for five days. That's another factor. It was a different police department even that got these statements from him. Yes. The statements are done by an officer from the ---- Officer Baggs. Local Arizona Police Department in Tempe. And there's a DEA agent with him. But, Your Honor, once he's been intimidated and threatened, once he's been kept for five days without seeing a judge, a man with a 70 IQ, in the courts we treat people with low mental capacities differently. We don't execute people that have IQs of 70 or less. He reads like an 8-year-old. All of these factors should go into suppressing his statements. Additionally, I understand that this Court has held in Bach that we don't look solely at the right, the fact that he has not been informed of his consular rights under the Vienna Convention. The Supreme Court has confirmed that. I understand. Well, yes, Sanchez-Lamas pretty well decided that, did it not? But it's all I'm asking this Court to look at is that as a factor. I mean, by the time of 2003, these officers should have known to have advised him of that. When you look at the totality of the circumstances. Yeah, you know, you have a heck of a good argument for a trial court. But, again, the district court looked at all of these things and made a negative credibility finding. Says, I don't believe any of this stuff happened, because he didn't report anybody in the 47th district, didn't report this to anybody in the 47th precinct. There's no medical reports that substantiate this. He didn't tell Baggs about it when he went to Arizona. He says, I credit the officers, who say, yes, somebody wrestled him to the ground. There's no doubt about that. So you've got a negative credibility finding with respect to your client's claims. And that's why I ask the Court to look at these facts objectively and find that she's wrong. Well, we still have a very high threshold. We just can't reexamine the facts. We'd have to apply our standard of review, would we not? I understand that, Your Honor. Didn't Clare have prior experience with the justice system? He testified he'd been arrested four and a half years earlier, was read as Miranda's rights, and waived them at that time also. He had been tested, yes. His experience was limited. He had been arrested on one time, never been charged, never been in front of a judge, didn't know the process. Your Honor, the second issue that this Court should reverse this conviction and return it for a new trial is that the government breached its agreement. There was a free talk agreement that was entered into, and I signed it on behalf of Mr. Sinclair, and I read it to him, and he signed it. But the government didn't play fair. We had a free talk agreement, and the purpose of that free talk agreement was to allow the government to evaluate what his testimony would be and what he could give to them, and whether or not he was being honest and whether or not the information was going to be of any use to them. What's the showing that the government behaved in bad faith? The fact that they had four meetings with us, they made promises to me over and over again as to the what they were going to do. But wasn't it all contingent on the government's determination that he was telling the truth, speaking without guile and holding nothing back, and then the government concluded he was not telling the truth? If the government knew that, they had an ob – I believe they had an obligation to tell me why they didn't think he was telling the truth. Your Honor, the three of you. You mean they never told you – they never told you why? No. All I was told is that he's lying about whether he killed the individuals. Your signature is on an executory contract, essentially. Yes. And the offer is, if all of these occurrences take place, then, only then, at the discretion of the government, will the government decide whether or not he was telling the truth. Relief be granted. Your Honor, the – At the discretion of the government. It's not – I don't think it's a debatable issue here. Let me give you my debate, is that the purpose of that agreement was for a free talk, one talk, all right? If you look at the language, you look at the heading, it's a talk. We didn't re-execute the agreement each time we met. We met four times. I understand that the second one was they came back to me and said, we want to clarify a few issues. Why didn't you tear up the agreement and enter a new one? If that – if you were convinced then that you had a one-talk obligation, period, why didn't you get a supplemental agreement? Shame on me. Shame on me. I felt that I had a right and could rely upon what they were telling me. Weren't they telling you your client's lying about whether he killed people? Not until after the fourth meeting. And I – Your Honor, the – Rules one and rule two – rule one and rule two is what we call it in Idaho. It's a deal and it's your fault. It may be. It may be. And there may be another court that determines whether or not I was ineffective or not. But what happens in this case is we have the first meeting. He explains to them all the facts. They come back and ask for a second one. We have the second meeting. With your consent. With my consent. There is then a fourth superseding indictment. I'm now concerned. So I start having conversations about what are you guys doing? What do – you know, what's our deal? We need to talk to him some more. We need to talk to him some more. We don't sign anything. Shame on me. We end up having a fourth meeting. But where does it say on this record one meeting and one meeting only and no more than one face-to-face meeting? Look at the language in the free talk agreement. It talks about a free talk. It doesn't talk about multiple talks. But I mean, the ordinary understanding of that is we're going to get together and talk this through until we come to a conclusion. I mean, I participated in millions of these things. Rarely was it just one time. The guy lays it out. The government goes back and says, what about this? What about that? I mean, it's a continuing kind of a discussion. It generally is. And I would agree with you that – but in this case, it was four times. I've done this for 20 years, too, Your Honor. It's rare to have four separate discussions. But where I think the government actually – I figured out after three the guy was lying or telling the truth. Well, I thought he was telling the truth. I still think he was telling the truth. And if you – and the government never told me why they felt he was lying. I never knew who the witness – it wasn't until trial that I now speculate that they had Stone, who said – who came in and was their key witness, that that was what they were relying upon. Where in the contract do you have the right to know why the government did that? It's not in there, Your Honor. No, in a written agreement, that's the agreement. I understand, but I believe that implicit in every written agreement is fair dealing. And I don't believe the government acted fair. And if they – if they believed before the fourth hearing, the fourth meeting, that he was already lying, I think they had an obligation to tell me. And I believe they sandbagged me. In addition, says the district court, the government has offered support for its belief that Sinclair was untruthful and thereby breached the agreement. Defendant Sinclair has not offered any evidence, however, to support his belief that the government is acting in bad faith. The government – the court would not allow a hearing. I filed three separate motions. She denied all three. The first one denied without prejudice. I was asking for a hearing. We never had a chance to have a hearing. I never got a chance to testify about the oral conversations that I had with counsel and what they told me. And I think that became important. And I think when the government gets to this point where they've had four hearings Who are you? I'm sorry? What's your name? Dan Maynard. Mr. Maynard, is there anything you want to add or state at this time to your motion? No, Your Honor, I rely on the papers. It's just oral argument, Your Honor. The court asked you, you got anything to add? And you said no, you rely on the papers. I mean, you just told us you were foreclosed from adding anything. I believe that we were. I was asking for a hearing. She said you got anything else. No, I rely on the papers. I mean, I know your name, but I was – I understand. Okay. I mean, when a court says you got anything else, if you were to say yes, Your Honor, I want to testify as to what I was told and you said I rely on the papers. Your Honor, I – So she didn't – the court didn't deny you a hearing. And the government? The government as well. Okay. And then she makes a ruling. If you rely on the papers, you rely on the papers. Counsel, you're down to about under four minutes. It's your time, whatever you'd like to do with it. Let me reserve the last very good. We'll hear from the government. Good morning, Your Honor. May it please the Court, Linda Boone on behalf of the United States. Defendant Lloyd George Sinclair was a street savvy drug dealer who got caught in a big lie and never raised any complaint until after he did not receive the cooperation plea agreement that he hoped to receive. Both of the psychologists who examined this defendant agreed that the defendant understood specifically his right to remain silent and that he had a rational and factual understanding of the criminal charges. Those can be – those written reports can be found at the government's SCR at the very beginning, pages 13, 14, and 20 to 21. The district court also specifically found that this defendant had prior experience with the criminal justice system, as this court has mentioned to my opposing counsel. Defendant Sinclair, when originally arrested in 1998 in Tempe, chose to lie about his knowledge of marijuana and he got away with it that time. And when he was arrested again in 2003 in New York, he chose to act again as if he knew nothing about what was going on. And we know that that was his choice because he revealed that to Dr. Hollebeck, and that is also in Dr. Hollebeck's report. However, this time, his attempt to play the innocent didn't work. He got caught in the lie and he lost. Lies are bad. They are, Your Honor. Who's Kevin Stone? Kevin Stone is a co-defendant in this case. Was he called by the government as a witness? Yes, he was, Your Honor. Did he lie on the stand? No, Your Honor. Did he lie in his naturalization papers? Yes, he did, Your Honor. Was that under oath on the naturalization papers? It's written – it's not under oath before a – No, but what does it say where he's – It says – yes, it does, Your Honor. And that – And the government knew that before it called him to the stand? That's questionable, Your Honor. However, what I would like to bring to the Court's attention is that the defendant never objected at the trial court level. And so therefore, the government never had an opportunity to make a record at the district court level. Neither did the district court have an opportunity to make a finding. And that's a problem. What the defendant objected to was solely the implication that the defense counsel had lied regarding the sexual assault investigation or arrest. Well, how did this – have you seen this naturalization form? Yes, Your Honor. How did it get into the case? The naturalization application form was given to defense counsel as part of discovery. And although there is no record that that came to him as part of discovery, his reference to the small numbers on the right-hand corner of the application is the indication of the government's bait stamping. It was like 2,105. Where do you think defendant got that information? The government gave it to him. Whether or not the government ever said, oh, by the way, Mr. Maynard, if you look at the discovery, you will see that, obviously, Mr. Stone lied on his naturalization application. I can't say, because we weren't able to establish a record at the time. However, when the defense counsel was course-examining him, he immediately, immediately impeached him on his lies on the naturalization application. So the jury had a full opportunity to judge the credibility of this defendant. And he full ---- If the government knows he lied on that form, the government's got an obligation to so notify the defense before the trial. If the government ---- And you're saying the record just doesn't show one way or another. Correct, Your Honor, because, no, again, again and again, the defendant has raised objections only after the trial is over, at appeal. The defendant ---- excuse me. The government had no opportunity to present any record on that. And this Court should advise the defendant that he has raised that issue too late. The Court could have known whether or not the government knew there was a lie, but it didn't. But, again, the jury had ---- We don't have a foundation for Brady, Giglio, or anything else. None whatsoever, Your Honor. The only issue was, did the government improperly question the witness stone on whether or not someone was lying if they said he'd been arrested? That was kind of out of bounds to ask that question. Kind of out of bounds, yes, absolutely. Your Honor, I'm not saying that it wasn't the manner, but not what the government was trying to do. It's quite proper on redirect for the government to clear up an issue that had been muddied by defense counsel. But not to enclose it. But not, yes. That's the heat of battle kind of thing one says. Absolutely, Your Honor. I fully agree. My time is limited, Your Honor. Could the Court tell me if there's a specific issue they'd like me to address? I have one question for you. Yes, Your Honor. In connection with the sentencing, we have two cases that have recently been argued in Bank. And I'm wondering whether we should hold our opinion pending those decisions and give you both an opportunity for supplemental briefing or what your forecast is with respect to that in Bank. Your Honor, the government would submit that this Court's cases of mixed and camp trial have laid out a standard of review and that the district court followed those steps so that this Court has a sufficient amount of evidence for a review. Are you saying we're not called upon in this case to determine whether or not the sentence was reasonable? No. That's the issue that's in front of Carty and Zavala and Bank just out here. Yes, Your Honor. But in this case, we don't. Well, if that case gives something that's controlling, then you're right back in court again with a habeas petition, aren't you? Perhaps not, Your Honor, because we've got to go. I'm sorry. Is the Court waiting or do you guys want an opinion right away? The government would like an opinion, Your Honor. Let me pinpoint a question. Sir, please. The Court determined that he had a managerial role and gave him three points for that. Isn't that a problem here? Or because it's a 43, the three points don't make any difference? No, Your Honor. The defendant, by his own admissions, made the setup for the drug rip-off, contacted the drug dealer, got him there, made the plan, led the other people there, picked the spot, got the marijuana, packaged it up, shipped it to New York, recovered it in New York. That's true. But did the jury find that he had a managerial role? No. The jury did not make that finding. But this Court's law says that the district court may make the findings necessary to determine the guideline applications. So that was correct for the court to make that. And the jury did find that the defendant was guilty of all of the offenses. So by implication, he must have had that role. If he was the one who was involved in the money laundering, the murders, it was a fair implication by the district court, Your Honors. No further questions? No further questions. Thank you, Your Honor. Thank you, counsel. Mr. Maynard, you have some reserved time. Yes, Your Honor. Just briefly on the prosecutorial misconduct, Your Honor, I believe she's accurate when she says that we did get the document from the government, but that the government never told us that he was lying. What the evidence shows in this case is that I asked Mr. Stone, while he was on the stand, when you were being prepped by the government, did you tell them that you had lied in your document? And his answer was yes. That's what the evidence is. When they came up to rehabilitate him, they never, they've never denied that they knew. So for the government to sit there and say now we didn't know is a little disingenuous. But what's the damage? I mean, you handled it very nicely and beat the government up with it pretty badly and the witness. So how does it result in an unfair trial? When they come back to rehabilitate him, this is the point where I believe that the government is, I think it was inappropriate because they violated Gigolo and Brady at the beginning. But it's also inappropriate when they come back to rehabilitate him. As I put out in, as I put in the reply, the questions that were asked were, was the only thing that you lied in this document about was your selling or use of marijuana? In fact, there were at least three other areas that he had lied about. The government, in other words, got him to commit perjury to try to rehabilitate this witness. Did you ever, it's one, you know, these witnesses are slippery at best. And so he says he told the government he lied. But did you ever lay a foundation and go back to find out whether the government agreed with that or not? I did. I did. I mean, it's almost always the government's going to say, he never told us that. I mean, that it just spirals down farther. So all you got is his statement that he told the government. You never got a government admission that they knew it. That's right. I don't. I would have expected the government to have gotten up and say, that's not true. You really didn't tell us. Now, did you? They never did that. No, they just accused you of being a liar on something else. No, that was the next thing that happened. Yeah. I mean, there's no question. The court had entered an order on a motion in limine. I violated it. I didn't intend to. It was in the heat of the cross-examination. I wish that I hadn't done it. But I wasn't a liar. I may have been inept. And the government's clearly, the last question, they wanted to leave that jury with the impression that I was a liar. And they wanted to leave that jury with the impression that I had overstepped my bounds in the cross-examination of this witness on those naturalization applications, because I had argued that he had misstated on at least four separate areas. And the government comes back and says that he's only misstated on one. He's just a little liar, not a big liar. Well, that's sort of what their argument is, and I'm the liar. That's the implication. When you look at all of this in context. Yeah, but when you step back and look at the whole thing in context, how did it damage his right to a fair trial? I mean, it seems to have been handled all right. You got out what you wanted to get. You beat up the government with the form. Not enough. My guy got convicted. If I'd gotten what I wanted to get, he wouldn't have gotten convicted. My client always cooperated with the government and always contended that he was involved in a marijuana-selling operation. He has always denied that he was involved or was a shooter in this murder. This was the only witness who puts a gun in my client's hand and who says that he is the one who killed two of these individuals. Your Honors, even when they arrest him, they don't find a gun in the facility. How many drug dealers do you arrest and they don't find a gun in the apartment that he's living in? They didn't find one here. What did Stone get in return for his help to the government? He got the cooperation of the government, and I don't know at this point what he got. I suggested to the Court, and again, I don't know, but I bet you he didn't get deported. He's still driving a bus in Phoenix, Arizona. His testimony was that the government was going to assist him in sentencing, but I don't know what he has at this time. I don't know when he got sentenced. Thank you, Counsel. Your Honor, I do think that we should wait until after the Court has determined the issues on reasonableness before we get a decision. It seems to me like it would be a waste of time for the Court to rule on Bach and then us to have to come back again. Thank you, Counsel. The case just argued will be submitted for decision.
judges: Beezer, O'scannlain, Trott